**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF THE VIRGIN ISLANDS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | **NO. 3:19-79-1, 3** |
| | : | |
| **IVAN JAMES, JOH WILLIAMS** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                      **May 16, 2024**

A jury evaluated nine days of evidence before finding Ivan James guilty of conspiracy to manufacture and distribute marijuana and cocaine, possession with intent to distribute 1,000 marijuana plants, possession of a firearm in furtherance of a drug trafficking crime, and using, carrying, and discharging a firearm during and in relation to a drug trafficking crime causing a murder. The jury also acquitted Mr. James of three charged crimes. Mr. James now moves for acquittal arguing the verdict cannot be sustained by the evidence. He also moves for a new trial seeking dismissal of certain charges based on the language chosen by the grand jury, a return to arguments denied before trial, and a strain seemingly challenging either or both the United States' disclosure conduct or our trial day management under the Due Process Clause. We are not persuaded by Mr. James's due process conclusions. But we also express our concern today with the United States Attorney's candor and diligence on a tangential issue of sealing records not affecting the proofs or overwhelming evidence of guilt.  The jury carefully considered substantial evidence offered by all parties, found Mr. James not guilty on some charges and guilty on others, and returned a verdict amply supported by the extensive evidence of guilt on the convicted charges. We deny Mr. James's motion.

# I.    Facts presented to the jury.

We began trial as scheduled in mid-January 2024 before twelve jurors and three alternates. The United States introduced extensive eyewitness and investigator evidence. We granted in part and denied in part Defendants' requests for dismissal following the United States' case in chief. Ivan James and co-Defendant Joh Williams then introduced evidence.  The United States introduced two rebuttal witnesses. We today summarize the evidence of conduct from early 2013 through 2017 leading eventually to the grand jury's seven charges against Ivan James and four charges against Joh Williams returned on September 13, 2023. The adduced evidence demonstrated the thoughtful verdicts of the jury on four of the seven charges against Ivan James.

### *Joh Williams distributed drugs while incarcerated.*

The Virgin Islands held Joh Williams at the Golden Grove Correctional Facility on St. Croix in 2013 following an earlier murder conviction.  Mr. Williams managed a marijuana and cocaine drug trafficking operation within the Facility.[1] Ivan James supplied some portion of the marijuana distributed by Mr. Williams.[2] Corrections Officer Vivian Ford supported Messrs. Williams's and James's drug distribution in the Facility. Officer Ford used his access to smuggle in drugs or deliver payments.[3] Mr. Williams recruited other inmates such as Alexis Rivera to his "Sex Money Murder" gang to assist in retrieving packages of marijuana and cocaine dropped off along the Facility's perimeter.[4] Witnesses described Sex Money Murder as a sub-gang of the larger United Blood Nation gang.[5] Mr. Williams and his crew controlled the drug trade both in the Facility and on the east side of St. Croix.[6] Mr. Williams used at least two cell phones to coordinate his operations.[7] He spoke in code to convey orders and give instructions including  "food" or "plates" meant certain quantities of drugs.[8]

Facility Corrections Officer Samuel conducted a random search of Mr. Williams's prison cell in early 2013. Officer Samuel seized one of Mr. Williams's contraband cell phones and several "dime bags" used for drug distribution.[9] He viewed multiple text messages indicative to Officer Samuel of drug distribution activity by Mr. Williams occurring inside the Facility.[10] Facility officials notified local Drug Enforcement Administration (DEA) Resident Agent in Charge Tracy Gardner of the suspected drug activity.[11] Agent Gardner applied for a Federal Title III wiretap.[12]

Phone calls intercepted as part of the approved Federal wiretap from February 16, 2013 to March 17, 2013 confirmed Ivan James's role in Mr. Williams's drug trafficking at the Facility.[13] The wire captured calls between Mr. Williams and Officer Ford, Mr. Williams's sister Trisha Williams, and other unidentified persons.[14] Mr. Williams discussed drug quantities and distribution activity, as well as money and drug supply needs.[15] Mr. Williams's and Officer Ford's calls frequently reference Mr. James and his role in providing marijuana for the trafficking operations.[16] Mr. Williams discussed the sale of drugs while incarcerated and the money he believed Mr. James owed him in a recorded call with his sister Trisha.[17] Mr. Williams stated Mr. James gave him no discount on the drugs even though Mr. Williams was a "jail man."[18] The conversation continued to a discussion of whether Mr. James was a "jail man" and would also eventually be incarcerated.[19] Mr. Williams stated Mr. James was "not going to get no time" because "he no criminal in their eyes."[20] The recorded conversation with Trisha Williams continued about drugs and money owed to Mr. Williams.[21]

### *Ivan James's cocaine trafficking.*

Ivan James along with his brothers Kai and Taj James, their mother Iris James, and associates Adrian Augustine and Malachi Benjamin lived on the James family compound in the

LaGrange area near Frederiksted, St. Croix. Mr. James controlled the drug trade on the west side of St. Croix in addition to his marijuana operations with Mr. Williams.[22] He also organized and facilitated cocaine trafficking from the Virgin Islands to the United States mainland.[23] Mr. James used associates to purchase kilos of cocaine and smuggle them to the United States. Correctional Officer Ford assisted Mr. James in these efforts. Robert Brown, a member of a rival drug gang, witnessed Officer Ford purchase cocaine on Mr. James's behalf from Keith Louis at Mr. Louis's residence.[24] Officer Ford purchased at least twenty-four kilos of cocaine for Mr. James at various times.[25]

St. Croix airport employee Tillisa Ceasar smuggled cocaine for Mr. James many times.[26] Ms. Ceaser used her knowledge of airport systems and procedures to avoid detection and successfully transport the cocaine.[27] She smuggled at least two kilos of cocaine on each trip. Ms. Ceasar acted as a courier for approximately 100 kilos, or "bricks," of cocaine. Ms. Ceaser also recruited her then-boyfriend, Louis Ortiz, to Mr. James's organization.[28] Mr. Ortiz worked in airport maintenance and smuggling multiple kilos of cocaine by secreting them through security screening in his maintenance back-brace.[29] Once aboard the target aircraft he removed the life preservers from the under-seat pockets to stash the cocaine inside.[30] Mr. Ortiz and Ms. Ceasar initially received the cocaine at the James's residence.[31] Mr. James was present during the exchanges.[32] Mr. Ortiz and Ms. Ceasar received between $2500 - $3000 per brick they smuggled.[33]

Mr. James also procured cocaine by stealing it from others. Mr. James directed his associates to rob Mr. Brown of five kilos of cocaine.[34] And Mr. James personally paid Ms. Ceasar $5,000 after she stole several kilos of cocaine from a rival dealer's shipment at the St. Croix airport.

Violence accompanied and followed these heists. The jury heard evidence of Mr. James's associates pistol-whipping Mr. Brown and relieving him of his cocaine at gunpoint.[35] Mr. Brown

4

retaliated by later killing one of the robbers, Jermaine "Bird" Williams.[36] The jury heard testimony Mr. James then ordered his associates to kill Mr. Brown.[37] Associates of Mr. James ambushed Mr. Brown and an uninvolved friend as he sat in the back seat of a car in a St. Croix apartment complex parking lot.[38] Mr. Brown (and his friend) suffered multiple gunshot wounds but survived.[39] The jury heard evidence of Mr. James and his associates controlling the drug trade in the Frederiksted area of St. Croix and fighting against other drug gangs on St. Croix for control of drug distribution territory.[40]

### *Messrs. Williams and James's involvement in Levar Pogson's murder.*

The Virgin Islands Bureau of Corrections released Mr. Williams from confinement on May 24, 2017.[41] On the evening of May 25, Alexis Rivera, Nikki Brooks, Levar Pogson, and a fourth young male congregated around a table near a children's playground at the D. Hamilton Jackson Terrace housing complex, known as "Red Brick," in Christiansted, St. Croix.[42] Mr. Pogson went by the nickname "Bugsy" and belonged to the "NTG" sub-gang of the Bloods.[43] The group spent the early evening in Red Brick selling drugs, smoking, and hanging out.[44]

The jury heard from Mr. Rivera. He swore Mr. Brooks received a call from Mr. Williams sometime after 8:45 p.m. Mr. Williams told Mr. Brooks to "move."[45] Mr. Brooks departed for his "baby mom's house."[46] Mr. Rivera believed "something is about to happen" and took cover behind a tree on the far side of the park near a basketball court.[47] Bugsy departed for his grandmother's house but returned to retrieve a forgotten item from the park table.[48]

Mr. Rivera swore Ivan James, Joh Williams, and an individual known as "Fire" then approached the playground from the side closest to the Red Brick housing complex near the house where the "Candy Lady" lived.[49] They wore black long sleeve shirts and pants.[50] They wore ski

masks, but the masks were pulled up around the tops of their heads and not covering their faces.[51] Mr. James carried a rifle.[52] Mr. Williams carried a rifle and a handgun.[53] Mr. Rivera saw Mr. James shoot Bugsy.[54] Mr. Rivera then ducked behind the tree and heard additional gunshots. After a few seconds lull, Mr. Rivera looked again and saw Mr. Williams stand over Bugsy and fire multiple shots into Bugsy from an "assault rifle."[55] Mr. Rivera heard over fifty shots fired.[56] Mr. Williams and Mr. James then ran to the back of Red Brick and left in a loud truck.[57]

Defense witnesses swore to a different version of events. Mr. James spent the afternoon and evening of May 25, 2017 at his residence "flipping chickens" and at no time left his property.[58] Mr. Williams spent his first full day out of prison preparing to relocate to Florida.[59] He procured a Virgin Islands voter identification card to facilitate his travel.[60] Mr. Williams reunited with his father, John Williams, at a St. Croix pool hall during the afternoon.[61] John Williams swore he heard gunshots at his home near Red Brick a few minutes after 10:00 p.m.[62] He called Joh and confirmed his son was safe.[63] He spoke to his son once more about forty-five minutes later before going to bed and again confirmed his son's safety.[64] Defendants adduced evidence Joh Williams spent the entire evening and night at his sister's home in Frederiksted babysitting his three young nieces and nephews while his sister worked a late shift at a restaurant.[65]

The jury also heard evidence of Johnny Encarnacion's presence at Red Brick on the evening of May 25, 2017. Mr. Encarnacion's mother calls him "Nikki" and his friends call him "Brooks," but no one calls him "Nikki Brooks."[66] Mr. Encarnacion swore he did not know Alexis Rivera and Mr. Rivera was not present at Red Brick on the evening of Bugsy's murder.[67] Mr. Encarnacion and Bugsy were lifelong friends.[68] Mr. Encarnacion, Bugsy, and two other friends Shady and Cally, were together on the front side of Building Four in Red Brick housing complex on the evening of May 25, 2017.[69] Bugsy received a phone call and left the group.[70] Bugsy paced

back and forth near the playground at the rear of Building Four as he talked on the phone.[71] Mr. Encarnacion heard a woman scream followed by a "heap" of gunshots thirty minutes to an hour later.[72] Mr. Encarnacion and many others began running from Red Brick as bullets hit cars and buildings around them.[73] He returned to Red Brick after the danger passed and learned of the shooting.[74] He investigated and found Bugsy dead on the ground by the park.[75] He did not see who shot Bugsy.

The storylines converge again when Virgin Islands Police arrived in Red Brick shortly after the 911 call for shots fired.[76] Investigator Evanya Schuster arrived on scene at 10:24 p.m., took photographs, and catalogued evidence.[77] She found Mr. Pogson laying on his back in a pool of his own blood, face up, on the sidewalk between the park and Red Brick Building Four.[78] He wore a white t-shirt and red shorts. The colors indicated his membership in the Bloods.[79] His pockets contained dime bags of marijuana, a loaded handgun magazine, and an empty handgun holster.[80] Multiple bullet ricochet marks from bullets striking the sidewalk and deflecting away surrounded his body.[81] Investigator Schuster collected dozens of shell casings from the park and adjacent grounds.[82] Virgin Islands Police Lieutenant Naomi Joseph also arrived at Red Brick in response to shots fired and assumed duties as the on-scene commander.[83] Lieutenant Joseph saw both Mr. Rivera and Mr. Encarnacion at Red Brick that evening but spoke to neither of them.[84]

Dr. Jaqueline Pender later conducted an autopsy on Mr. Pogson. She documented seventy-eight gunshot wounds mostly to his face and upper body.[85] Dr. Pender identified the cause of death as gunshot wounds, but Dr. Pender could not identify which shot killed Mr. Pogson because so many were fatal.[86] Dr. Pender concluded most shots travelled left to right and front to back.[87]

Mr. Rivera swore he spent the next few months hiding with family for fear he would be killed.[88] He gave Virgin Islands police his account of Mr. Pogson's murder two or three months

later after police arrested him for an unrelated crime.[89] He told Virgin Islands Police Detective Ortiz Joh Williams, Ivan James, and Fire murdered Mr. Pogson.[90] He identified Mr. Williams, Mr. James, and Fire from a police photo line-up.[91]

Investigators swore they also found forensic evidence tying Mr. James to Mr. Pogson's murder in addition to Mr. Rivera's eyewitness testimony. Shell casings recovered from the Red Brick murder scene matched the calibers of three firearms recovered weeks later from Mr. James's residence: a 7.62 caliber AK-47 rifle, a .223 caliber AR-15 Rifle, and a .40 caliber Glock 22 pistol.[92] Investigators conducted forensic toolmark analysis of the shell casings and compared them to test-fires from the recovered firearms. Investigators concluded the AR-15 Rifle later found at Mr. James's residence fired shells recovered from the Pogson homicide.[93]  Investigators also concluded the Glock 22 pistol fired shell casings from the Pogson homicide.[94]

DNA swabs of the AR-15 rifle and Glock 22 pistol also matched to Mr. James. The Glock 22 contained DNA from at least four individuals. Investigators concluded both Ivan James and Levar Pogson were possible contributors of the DNA on the firearm.[95] Investigators also found "extremely strong support" the AR-15 rifle had Mr. James's DNA on it.[96] They excluded Mr. Pogson as a source of DNA on the AR-15.[97] Investigators excluded Mr. Williams as a source of DNA on the AR-15 and could not determine if his DNA was on the Glock 22 pistol.[98]


*Agents eradicate over 1,000 marijuana plants at and around Mr. James's residence.*

Federal and Territorial agents on St. Croix launched a marijuana eradication operation in the vicinity of La Grange, St. Croix on July 14, 2017.[99]  DEA Task Force Officer Aldemar Santos flew over the area in a small plane as a spotter for marijuana grows in the rural fields and properties in the La Grange area.[100] Officer Santos used a digital camcorder to aid and document his

observation.[101] He observed six marijuana grows in the fields surrounding Mr. James's residence.[102] He directed ground-based DEA Task Force agents to those grows to eradicate them. DEA Agents Tracy Gardner and Mark Cory and DEA Task Force Officer David Wyrzkowksi, along with other law enforcement personal, removed and destroyed 1,005 marijuana plants from five of the six grows around the James residence.[103] Agents removed potted marijuana plants from grows one through four.[104] Agents removed more mature, in-ground plants from the fifth grow site.[105] The sixth grow was closest to the James residence. Unknown persons removed this sixth grow between the time it was spotted from the air by Officer Santos and when agents arrived at its location.[106] Agents also discovered and photographed lights, irrigation equipment, power equipment, water, water filters, and other indicia of marijuana cultivation.[107]

Edwin Felto surveilled the agents using a drone while the agents eradicated the marijuana.[108] Mr. Felto refused to identify himself to agents, stated the agents should not be there, and attempted to order the agents off the land.[109] Mr. Felto flew the drone for fifteen minutes.[110]

Agents did not scientifically test the marijuana plants. Agent Gardner confirmed to her knowledge the plants as marijuana based on her years of experience with the plants and the drug.[111] Agent Cory confirmed his knowledge the plants as marijuana based on twenty-five years of experience in eradications, the plants leaf structure, height, and smell.[112]

Mr. James accompanied by two others confronted the agents during the eradiation operation.[113] Agent Gardner recorded the interaction.[114] Mr. James angrily approached the agents and accused them of stealing his property by calling the agents thieves.[115] He demanded to see a warrant.[116] Agent Cory attempted to explain to Mr. James the agents did not need a warrant as the marijuana was in open fields.[117] Mr. James made derogatory comments about Agent Gardner and

Agent Cory. Mr. James and his companions continued to advance towards the retreating agents until the agents entered their vehicles and departed.

Mr. James also recorded his interaction with law enforcement and broadcast it in real time using the Facebook application and its "Live" feature.[118] A concerned citizen saw the broadcast, recorded it, and sent it to DEA Task Force Officer Cassandra Desemo.[119] The recording shows, from Mr. James's angle, his interaction with law enforcement.[120] The recording also captured Mr. James surveying the fields from which agents seized his marijuana plants. Mr. James confirms his understanding of the number of plants seized by stating on the recording "gone with a thou[sand]."[121] Mr. James made the video admitting the number of seized plants before the agents counted the plants.[122]

### A search uncovers guns, marijuana, and cocaine at Mr. James's residence.

DEA agents conducted a search under a warrant of Mr. James's residence on August 3, 2017 based on the discovery of the marijuana plants in July. Agents detained at the residence Kai James, Kai and Ivan James's mother Iris James, Kai James's girlfriend Malika Felix, and Adrienne Augustin.[123] Malachi Benjamin fled from the residence and evaded capture.[124] Agents did not see Ivan James.[125]

Agents seized many items from Ivan James's room in the residence. Agents found two cell phones whose telephone numbers linked to current and past drug activity.[126] Agents seized a .40 caliber Glock 22 pistol with a 50-round drum magazine. Agents found four rounds of .223, one round of 7.62, and one round of .45 caliber ammunition.[127] Mr. James's closet contained a bag with eleven individually wrapped marijuana baggies totally 302 grams.[128] Agents also recovered a drone from the closet.[129]

Agents seized additional items from various other locations in the residence. Agents found a digital scale in the kitchen.[130] Agents seized a loaded 7.62 caliber Romarm AK-47 rifle found leaning against wall directly next to the door of Mr. Augustin's room.[131] Agents found another bag of marijuana with 33 individually packaged baggies totally 125 grams, a digital scale with marijuana residue, a 463 gram package of cocaine, and $1900 in cash.[132]

Agents received consent from Iris James to search her room.[133] They found under her bed a loaded and chambered .223 caliber Olympic Arms AR-15 rifle with two attached magazines. Agents found a pair of men's shorts with two loaded .40 caliber pistol magazines in the pocket by a dresser.[134] Agents also discovered marijuana growing equipment in the back of a dark Ford Ranger pickup truck parked at the residence.[135]

The Virgin Islands issued a warrant for Mr. James's arrest. Mr. James remained at large for several months. U.S. Marshals eventually apprehended him in Ponce, Puerto Rico on April 7, 2018.

### II.  Grand Jury charges Ivan James with seven crimes leading to trial.

The grand jury first charged Ivan James with crimes in an Indictment returned December 18, 2019, adjourned for COVID-19 mitigation, and eventually returned a third superseding Indictment on September 13, 2023.[136] The citizens charged Ivan James, either individually or with others, with seven crimes:

- Conspiracy to manufacture and possession with intent to distribute marijuana and cocaine from January 1, 2013, until September 2019;[137]

- Possession with intent to distribute 1,000 or more marijuana plants on July 14, 2017;[138]

- Possession with intent to distribute 500 grams or more of cocaine on July 14, 2017;[139]

- Possession of an Olympic Arms AR-15 rifle, a Glock 22 pistol, and a Romarm AK-47 rifle in furtherance of the drug trafficking conspiracy on August 3, 2017.[140]

- Using, carrying, and discharging an Olympic Arms AR-15 rifle and a Glock 22 pistol during and in relation to the drug trafficking crime, and in the course of that crime causing the death of Levar Pogson, on May 25, 2017;[141]

- Using, carrying, and discharging an Olympic Arms AR-15 rifle and a Glock 22 pistol during and in relation to the crime of violence of murder, and in the course of that crime causing the death of Levar Pogson, on May 25, 2017;[142]

- Murder of Levar Pogson in a willful, deliberate, and premeditated manner, on May 25, 2017.[143]

The pandemic delayed discovery and events beyond our control delayed trial from the 2019 first Indictment.[144] Mr. James, his co-defendants, and the United States together moved for relief scores of times. Defendants and the United States presented argument during two omnibus motions hearings.[145] We also discussed issues in many telephonic conferences.

Mr. James moved for pretrial relief on many issues. He moved for a *Starks* hearing on the recorded phone calls.[146] He moved to dismiss the Indictment because it lacked the foreperson's signature.[147] He moved to suppress evidence obtained during the marijuana eradication and the search of his residence.[148] He moved to sever the murder charge.[149] And he then later moved to further sever his trial from Mr. Williams's because the United States planned to introduce Mr. Williams's statements about the conspiracy against Mr. James.[150] He joined in other Defendants' request to dismiss the conspiracy charge for containing both marijuana and cocaine.[151] He also joined in other Defendants' Rule 702 motion to limit expert testimony on firearms toolmark

analysis.[152] Mr. James continued to move for relief during trial. He moved to dismiss the Indictment for prosecutorial misconduct.[153] And he moved to exclude DNA evidence.[154]

We picked a jury and began trial on January 19, 2024. The trial lasted nine days. The United States in its case-in-chief presented testimony from thirty witnesses. The United States also introduced over one hundred photographs, nine recorded phone calls, seven videos, four firearms, two packages of marijuana, one package of cocaine, an iPhone, and several documents.

Mr. James and Mr. Williams moved to dismiss under Rule 29 at the close of the United States' case. Mr. James moved to dismiss all three firearms charges and the murder charge.[155] He argued the lack of sufficient DNA evidence required we acquit.[156] He also moved for acquittal on the charge he possessed 500 grams or more of cocaine on July 14, 2017 because the United States presented evidence of cocaine seized on August 3, 2017 weighing only 463 grams.[157] Mr. Williams moved for acquittal on all counts for insufficient evidence.[158] He specifically argued the evidence did not show a conspiracy but instead a "buyer-supplier" relationship concerning marijuana between Mr. Williams and Mr. James.[159] We granted in part Mr. James's motion on the cocaine charge with the United States conceding the lower amount of seized cocaine. We amended the charge to the lesser included offense of possession of a "detectible amount" of cocaine.[160] We denied without prejudice Messrs. James's and Mr. Williams's Rule 29 requests during trial.[161]

We held a lengthy charging conference before closing arguments and instructing our jury.[162] We addressed requests and objections from all parties and amended several of our instructions based on counsel's arguments.[163] We denied a request by Mr. Williams for an adverse inference instruction concerning Mr. Williams's allegedly missing records from the Virgin Islands Bureau of Corrections.[164] We denied Mr. Williams's request for separate verdict slips.[165] Mr. James joined Mr. Williams's objections but expressed no other concerns with the verdict slip.[166]

All parties presented closing arguments after our conference. We confirmed our final jury instructions with all counsel by email that evening with further discussion set for the next morning. We then instructed our jury. It began deliberations.

The jury deliberated over the course of two days. It asked questions during their deliberations. It requested a copy of the jury instructions and all printed evidence.[167] We provided both for its review. It asked to return to the courtroom to view the firearms and the packages of drugs seized during the search of Mr. James's residence.[168] We ordered the United States to present these items in open court without comment beyond identification of the items. Both Messrs. James and Williams along with their counsel did not object to presenting the evidence in their presence.

The jury reached a mixed verdict late on the afternoon of the second day of deliberations. The ample evidence led the jury to find Mr. James guilty of four crimes: (1) conspiracy to manufacture and possession with intent to distribute marijuana and cocaine; (2) possession with intent to distribute 1,000 marijuana plants; (3) possession of an Olympic Arms AR-15 rifle, a Glock 22 pistol, and a Romarm AK-47 rifle in furtherance of the drug trafficking conspiracy; and (4) use, carry, and discharge of an Olympic Arms AR-15 rifle and a Glock 22 pistol during and in relation to the drug trafficking conspiracy, and in the course of that crime causing the death of Levar Pogson.[169] The jury found co-defendant Mr. Williams guilty of conspiracy to manufacture and possession with intent to distribute marijuana.[170]

### III.    Analysis

Mr. James moves for acquittal under Rule 29 and for a new trial and vacation of the present verdict under Rule 33.[171]  He seeks to overturn the jury's verdict on all four convictions. He argues the evidence adduced at trial is insufficient to sustain the verdicts. He argues pretrial and trial

errors merit a new trial. We disagree. The evidence of guilt on the four convictions is overwhelming. Mr. James offers no basis for a new trial.

The United States adduced evidence of Ivan James and Joh Williams (while often acting separately in alleged criminal conduct involving violence and drug distribution) became associated through a common interest in criminal conduct on St. Croix through drug distribution and an alleged role in the murder of Levar Pogson in May 2017.

The evidence began chronologically through a search of the incarcerated Joh Williams's cell phone leading to evidence of his and others' drug dealing in a St. Croix correctional facility including through a correctional officer. The drug dealing led authorities to Ivan James mentioned on recorded phone calls. Several years passed and then someone murdered an alleged rival drug dealer Levar Pogson on St. Croix the day after Mr. Williams returned to St. Croix for a short visit in May 2017 immediately following his release from custody. An unconnected marijuana eradication operation based on aerial surveillance of several plots of land several weeks after Mr. Pogson's murder linked Ivan James to drug dealing as confirmed by Mr. James's live video recording of the federal agents' operations. A subsequent search shortly after confirming marijuana of Mr. James's residence uncovered firearms linked to Levar Pogson's murder. The federal agents also found and seized marijuana and cocaine. Eyewitness testimony from a convicted felon impeached on cross-examination on several issues and forensic evidence then tied Mr. Williams with Mr. James with both holding Mr. James's firearms at the murder scene. The United States did not adduce the lead police investigator's testimony but did adduce testimony from other investigators. The ample evidence ensured the jury could and did find credible evidence of Mr. James's role in Mr. Pogson's murder but the United States did not prove Messrs. James or Williams themselves murdered Mr. Pogson or even present for the murder. The evidence instead suggested

the use of firearms tied to Mr. James and his drug distribution conduct but the jury discounted the testimony from other convicted persons claiming Messrs. James and Williams murdered Mr. Pogson.

We deny Mr. James's motion.

**A. We deny relief under Rule 29 because the evidence supports the jury's verdict.**

We find no basis to acquit Mr. James under Rule 29 because overwhelming evidence of guilt supports the jury's verdict on four of the seven charged crimes.[172]

### 1. Overwhelming evidence supports the jury's finding of conspiracy to manufacture and possess with intent to distribute cocaine.

Mr. James asserts the evidence does not support the jury's verdict he trafficked in cocaine. Mr. James argues the not guilty verdict on the substantive cocaine charge shows there was insufficient evidence for a guilty verdict on the cocaine conspiracy.[173] Mr. James does not cite any portion of the record to support his argument.

The United States adduced substantial evidence connecting Mr. James to cocaine trafficking over the course of the conspiracy. The conspiracy spanned a far greater time-period than the single date charged in the substantive cocaine offense. Agents found over 400 grams of cocaine during the August 3, 2017 search of Mr. James's residence.[174] Multiple witnesses testified they received cocaine from Mr. James directly or through his associates. Mr. James facilitated the transport of the cocaine for distribution in the United States. Robert Brown testified he witnessed Vivian Ford, an unindicted and now deceased co-conspirator of Mr. James, purchase at least twenty-four kilos of cocaine on Mr. James's behalf.[175] Tillisa Ceasar testified she acted as a courier for approximately 100 kilos of cocaine on Mr. James's behalf.[176] Louis Ortiz also participated in cocaine smuggling for Mr. James.[177]

The United States adduced evidence of Mr. James's role in stealing cocaine from other dealers. Ms. Ceasar testified she stole cocaine on Mr. James's behalf. Mr. Brown testified Mr. James directed his associates to rob him of five kilos of cocaine.

Our jury did not convict Mr. James of cocaine possession on July 14, 2017, likely because the United States did not adduce evidence Mr. James possessed cocaine on that exact date.[178] But it does not follow the jury must then return a not guilty verdict on all other cocaine charges. Ample evidence supports Mr. James trafficking in large quantities of cocaine during the conspiracy.

### 2. Overwhelming evidence supports the jury's finding Mr. James possessed 1,000 marijuana plants as seized from the James's property.

Mr. James admitted the agents seized over 1,000 marijuana plants on July 14, 2017. He knew the amount before the agents did.  He now argues the United States never scientifically tested the marijuana plants eradicated from the fields around his residence and thus cannot support his conviction. He further argues the marijuana plants are not connected to him. Neither argument carries any weight. He videotaped himself in a live feed on Facebook showing the world his plants and his ownership.

The United States adduced evidence at trial of the over 1,000 marijuana plants eradicated by law enforcement during the July 2017 eradication operation. DEA Special Agents Tracy Gardner and Mark Cory, and DEA Task Force Officers David Wyrzykowski and Aldemar Santos all testified to observing the marijuana plants, their belief based on their training and experience the plants were marijuana, the plants' locations, and the accompanying paraphernalia's consistency with marijuana plant growth operations.[179] Agents Gardner, Cory, and Wyrzykowski participated in the removal of the marijuana plants from the areas surrounding Mr. James's residence. All three credibly identified the plants as marijuana. The marijuana plants were potted in four of the five grow sites. And agents observed evidence of efforts at intentional cultivation such as water,

electrically, and filters. The United States showed many photos of the marijuana grows and of the technology used in support.[180]

The United States also adduced evidence linking Mr. James to the marijuana plants. The United States presented two videos – one taken by Agent Gardner and one taken by Mr. James himself – of Mr. James confronting law enforcement during the eradication operation. The video captured by Agent Gardner shows Mr. James's opinion the law enforcement personnel are taking his property.[181] Mr. James own Facebook live video filmed by Mr. James just after law enforcement personal left the property features Mr. James sweeping the camera around the areas previously occupied by the marijuana plants and stating "gone with a thou[sand]."[182] Law enforcement eventually counted 1,005 plants seized in the operation, confirming Mr. James's on-the-spot number of 1,000 plants.[183] The jury based the logical conclusion the marijuana plants belonged to Mr. James on testimony from multiple law enforcement personnel, Mr. James's own actions, and his thorough, first-hand knowledge of the marijuana plants.

### 3. Overwhelming evidence supports the jury's finding Mr. James possessed firearms in furtherance of the drug trafficking conspiracy.

Mr. James argues the United States did not link the Glock 22, AR-15, and AK-47 found in his residence during the August 2017 search to the drug conspiracy.[184] Mr. James argues the evidence is insufficient for two reasons. First, he claims the only link between the firearms and the drug conspiracy is Levar Pogson's murder. Second, he argues we wrongly admitted the DNA evidence obtained from the firearms because the United States never established how it obtained a comparative DNA sample from Mr. James.[185]

Ample evidence supports the jury's verdict of guilty on the charge of possession of firearms in furtherance of the drug conspiracy. The jury need not have convicted Mr. James of murdering Mr. Pogson to find him guilty of possessing firearms in furtherance of a drug conspiracy. And the

jury found Mr. James guilty of both the underlying conspiracy and of using a firearm during and in relation to a drug trafficking crime.

Layers of evidence supports the jury's finding Mr. James possessed the firearms. Investigators found all three firearms during the August 2017 search of Mr. James's residence. Agents seized the Glock 22 pistol from Mr. James's closet. They seized the AR-15 rifle from under the bed in the room adjacent to Mr. James's room occupied by his mother. And agents found the AK-47 by the door of Mr. Benjamin's room. Investigators recovered ammunition for all three weapons from Mr. James's room.

Investigators found Mr. James's DNA on both the Glock 22 pistol and the Olympic Arms AR-15 rifle. Investigators also connected the shell casings from the Pogson homicide scene to both weapons. Expert testimony by DEA Agent Kevin Rippman linked the shell casings recovered from the scene of the Pogson homicide to the firing pin of the Glock 22.[186] Expert testimony by DEA Agent Major Wells linked additional shell casings recovered from the scene of the Pogson homicide to the Olympic Arms AR-15 rifle.[187] Mr. Rivera placed Mr. James and Mr. Williams at that scene of the Pogson homicide while toting an automatic rifle and a handgun. These descriptions match the AR-15 and the Glock 22.

Mr. James is correct the United States never introduced evidence demonstrating how a comparative DNA sample was obtained from him. But the United States need not present every link in the evidentiary chain before the fact finder may consider a particular piece of evidence.[188] Even entirely disregarding the DNA evidence still leaves eyewitness testimony, scientific evidence, and circumstantial evidence linking Mr. James to the Olympic Arms AR-15 rifle, the Glock 22 pistol, and the Romarm AK-47 rifle.

Copious evidence connects the firearms to drug distribution activity. First, agents just weeks prior eradicated over 1,000 of Mr. James's marijuana plants in the fields directly adjacent to the residence where they discovered the firearms. Second, a drone surveilled agents during the eradication and the agents recovered a drone from Mr. James's closet next to the Glock 22. Third, agents located over 300 grams of marijuana and two cell phones connected to drug activity in the same closet as the Glock 22. Agents also found an additional package of marijuana and another of cocaine, drug dealing paraphernalia such as scales, and sums of cash throughout the residence.

The status of the firearms also supports the connection to drug activity. All three firearms were loaded and found with high-capacity magazines. The AR-15 had two magazines fixed together to facilitate rapid reloading and the Glock 22 had a 50-round drum magazine. All three firearms were assembled and placed in rapidly accessible locations: on a closet shelf (Glock 22), under a bed (AR-15), and next to a door (AK-47). Finally, the jury heard testimony of Mr. James and his associates using firearms against rival drug dealers. While not specifically linked to these firearms, the jury could permissibly conclude firearms were integral to Mr. James's drug trafficking operations.

### 4. Overwhelming evidence supports the jury's finding Mr. James used a firearm causing death during a drug trafficking crime.

Mr. James asserts the evidence does not support his conviction for using a firearm causing death during a drug trafficking crime. In Mr. James's view, the charge required the United States prove Mr. James murdered Mr. Pogson. Mr. James argues the United States failed to prove the required murder element and he is entitled to an acquittal.[189]

Our grand jury returned an indictment charging Mr. James with three crimes related to Mr. Pogson: two firearms charges premised on competing theories of liability and first-degree murder. The first-degree murder charge included liability through aiding and abetting Mr. Williams. The

firearms offenses resulting in death including liability through aiding and abetting any other person. The jury did not need to find Mr. James or Mr. Williams guilty of personally committing murder to convict either of them on the firearms charges. Rather the jury could convict upon proof Mr. James aided and abetted other persons in murdering Mr. Pogson with firearms provided by Mr. James to advance Mr. James on-going drug trafficking operations.

The United States adduced evidence from eyewitness Alexis Rivera to support Mr. James role in killing Mr. Pogson. Mr. Rivera testified three people murdered Mr. Pogson: Mr. James, Mr. Williams, and Fire.[190] The United States also adduced evidence through multiple witnesses of ongoing gang violence associated with drug distribution on St. Croix. Mr. Rivera, Mr. Brown, and Lieutenant Joseph each testified to this violence. The object of the violence was to defend or extend control of drug trafficking and distribution operations.

The jury's verdict supports the conclusion Fire murdered Mr. Pogson and was aided by Mr. James through in-person assistance, supplying the firearms, or both. Mr. Rivera's testimony and the forensic and circumstantial evidence support this conclusion by our jury. Overwhelming evidence connected Mr. James to the AR-15 and Glock 22 firearm linked to the killing. Overwhelming evidence further connected the two firearms to Mr. James's drug trafficking operations. We thoroughly discussed these connections above.

Our jury questioned portions of Mr. Rivera's testimony but did credit his testimony Mr. James played a role in Mr. Pogson's murder and it advanced Mr. James drug trafficking operations. What testimony they did credit is also supported by evidence uncovered by investigators. Mr. Rivera testified he saw an automatic rifle and a pistol on the night Mr. Pogson was murdered. Recovered shell casings from the Red Brick murder scene link to those two types of firearms: an AR-15 rifle and Glock 22 pistol. Mr. James's DNA and the discovery of those two types of

firearms in his residence tie him to both the AR-15 and the Glock 22. The jury's verdict also reflects testimony investigators could not reliably tie Mr. Williams to either firearm.

While our jury could have returned a guilty verdict on all three charges connected to Mr. Pogson's homicide, it need not have done so for us to sustain a conviction on only one charge. If the jury looked at the Pogson killing through the lens of the ongoing drug trafficking fueled violence, a conviction based on a charge of using, carrying, and discharging a firearm during and in relation to a drug trafficking crime is the most logical outcome. It appears our jury did not believe the theory underlying the murder charges and the alternative crime of violence firearms charge, *i.e.* someone killed Mr. Pogson for no reason.  The evidence instead allowed the jury to remain unconvinced beyond a reasonable doubt that the trio or more of individuals present at the scene of Mr. Pogson's death came purely to kill him. The jury's verdict demonstrates it saw Mr. Pogson's murder as part of the drug trafficking operations run by Mr. James. This rational and evidentiary-supported position aligns with the jury's verdict. The jury's conclusion also allows for the possibility Mr. James did not pull the trigger but instead provided the firearms and knew of others' intents.[191]

A guilty verdict on this firearms charge is also supported on a *Pinkerton* co-conspiracy liability theory on which we appropriately instructed our jury.[192] Even viewing the verdicts on these three charges as inconsistent or the product of compromise or even lenity does not require our intervention.[193] There is no missing element of murder. The evidence supports our jury's conclusion.

**B. We find no basis for a new trial.**

We also find no basis for relief under Rule 33. We afforded Mr. James extensive pretrial and trial time to ensure a fair trial without evidentiary, procedural, or substantive errors which could impact the verdicts.[194]

### 1. Mr. Williams's recorded conversation about Mr. James does not create a *Bruton* issue or merit a new trial.

Mr. James asserts we erred by not further severing his trial from Mr. Williams's trial.[195] Mr. James argues his joint trial with Mr. Williams violated his Sixth Amendment rights when the United States introduced Mr. Williams's recorded statements while incarcerated to his sister Trisha Williams on a recorded phone call Mr. James was "not going to get no time" in jail because "he no criminal in their eyes."[196] Mr. James earlier raised this same argument by pretrial motion.[197] The United States responds we properly admitted the statements, and further requests we reconsider our determination Ms. Trisha Williams was not a co-conspirator.[198]

The Supreme Court in *Bruton* prohibits the United States from introducing a non-testifying conspirator's confession against a co-conspirator at their joint trial.[199] The Court found this tactic violated the Sixth Amendment's Confrontation Clause. But the Court in *Bruton* did not eliminate the co-conspirator statements exclusion to the hearsay rule. The Supreme Court through Federal Rule of Evidence 801(d)(2)(E) allows us to admit co-conspirator statements even in a joint trial without offending the Confrontation Clause. We may admit non-testimonial statements which satisfy Rule 801(d)(2)(E)'s requirements.[200]

We thoroughly evaluated Mr. Williams's recorded statements while incarcerated including his statement referring to Mr. James's discount on drug prices and Mr. Williams's view of the likelihood the authorities would ever prosecute Mr. James. We found them admissible under Rule 801(d)(2)(E). The statements are non-testimonial. Mr. Williams made the statements during the

conspiracy and the entire conversation concerned the very nature of the drug conspiracy. Mr. Williams's statements came in the midst of his lament Mr. James would not give him a discount on drug purchases in spite of his incarcerated status. Mr. Williams expressed his belief Mr. James would not go to jail directly ties to Mr. James's role in the conspiracy, the relative power dynamics between Mr. Williams and Mr. James, and the immediate issue of Mr. Williams's missing payments.

We do not need to re-evaluate our ruling declining to find Ms. Trisha Williams acted as a co-conspirator. Mr. Williams's statements may be introduced regardless of Ms. Williams's status.[201] We appropriately cautioned our jury on several occasions it could not evaluate Ms. Williams's statements for the truth, but only to provide context to Mr. Williams statements.[202] We find no error here. Mr. Williams's statements are not *Bruton* material, and Mr. James is not entitled to a new trial.

### 2. The verdict slip properly directed the jury without objection.

Mr. James argues defects in the verdict slip require a new trial. He asserts (1) the verdict slip should have linked each question to a specific count charged in the Indictment rather than describe the charged crime by the date and allegations, and (2) the verdict slip should have been structured to first ask whether Mr. James murdered Levar Pogson before asking the jury to return a verdict on any of three charges involving Mr. Pogson's death.[203]

We disagree for several reasons. First, and as acknowledged by Mr. James, he did not object to the verdict slip at trial. We review for plain error when no objection to a verdict slip is lodged at trial.[204] "Under this standard, the [verdict slip] at issue is only reversible if the error is particularly egregious such that it seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."[205] The jury's guilty verdict for use of firearms causing death during a drug

trafficking crime is logically and factually supported by the evidence as earlier discussed. The form of the verdict slip did not convict Mr. James; overwhelming evidence of his criminal conduct led to the jury's verdict.

Even if Mr. James did object at trial, the form of the verdict slip is left to our sound discretion and will only be grounds for relief upon a showing we abused our discretion.[206] We crafted a verdict slip tracking the language of each charge brought against Mr. James. We did not present the Indictment to the jury nor did we ever describe the case in "counts." Those descriptors are simply charges which are not evidence of anything. We are not aware, and counsel did not request, we first ask whether Mr. James murdered Mr. Pogson before proceeding to consideration of the charges themselves. We followed the charges and presented them, without objection, in language understandable to counsel and the jury. Mr. James is not arguing the jury could not understand the approved verdict slip. The requested change would not aid the jury's fact-finding function. The questions on the verdict slip matched the charges brought by the Indictment. The verdict slip is not confusing, and Mr. James offers no basis for a new trial because of it.

### 3. Mr. James's repeated due process conclusions lack merit.

Mr. James's counsel repeatedly claimed we or the United States Attorney violated his due process rights. Counsel sought continuances. We granted more time than necessary given the gravity of the charges. His counsel wanted a different pace. But Mr. James cannot credibly claim our trial management violated his rights to due process. The case took over four years from the first indictment to trial. Mr. James had multiple opportunities to file, join, and argue pretrial dozens of motions.[207] Mr. James was competently represented by two counsel. His counsel thoroughly cross-examined the witnesses against him. They also objected to questions and evidence without

limitation. Mr. James through his counsel even presented two witnesses on his own behalf in an unsuccessful attempt to establish an alibi defense.

Mr. James offers a unique extension of due process law. He complains we did not grant an overnight recess before closing arguments. He points to no authority to support his position. The arrival of closing arguments could not be a surprise. Mr. James knew he would have the opportunity to present closing arguments. A time limit on lunch, a few days of trial which stretched past 5:00 p.m., and an eye to the efficient presentation of evidence and argument do not create unconstitutional limitations on Mr. James's rights. Mr. James had years of notice and hundreds of opportunities to object, move for relief, and challenge evidence. He succeeded in many of his arguments including for the severance he now laments. We faced a jury who asked for long days. We broke the first day after jury selection (due to the United States' delays) affording counsel an entire afternoon and evening to revise an opening statement they knew of since the Summer 2023. We afforded counsel more time than necessary. We find no basis for a new trial because the lawyers did not like the trial management when they did not object during trial.[208]

### 4.    There was no prosecutorial misconduct warranting a new trial.

Mr. James argues prosecutorial misconduct arising from the United States' failure to correct allegedly perjurious grand jury testimony from Agent Wyrzykowski contributes to the need for a new trial. Mr. James claims Agent Wyrzykowski committed perjury at the grand jury concerning: Mr. James's fugitive status, the disfigurement of Mr. Pogson's face, the presence of DNA on all firearms as opposed to just two, and which firearms Messrs. Williams and James each possessed at the Pogson homicide. In Mr. James's view, the United States' failure to correct these misstatements amounts to prosecutorial misconduct and requires a new trial. A "defendant seeking a new trial on the basis of prosecutorial misconduct must prove not only that prosecutorial

26

misconduct in fact occurred, but also that it rose to such a level as to render the jury's verdict unreliable."[209]

Mr. James raised mid-trial an identical argument.[210] We fully analyzed and denied his motion.[211] Mr. James's post-trial submission adds nothing new. He does not cite the record to support his position or show how Agent Wyrzykowski's grand jury testimony "caused bias" at trial.[212] It did not. The United States did not commit prosecutorial misconduct by failing to correct Agent Wyrzykowski's inaccuracies when testifying to the grand jury. The drastic remedy of a new trial is unwarranted.

### 5. The Indictment did not suffer from procedural errors.

Mr. James argues the lack of a signature and the possibility the grand jury served beyond its term limit constitute errors contributing to the need for a new trial. First, Mr. James attempts to re-litigate his previously denied pretrial argument lack of the grand jury foreperson's signature on the Indictment is error. But as we previously noted in our Order on his pretrial motion, there is no error here. *See* ECF No. 679. The Supreme Court through Federal Rule of Criminal Procedure 6(c) requires the grand jury foreperson sign the indictment. Our grand jury foreperson signed the Indictment. The signature page, which includes a notation reflecting the number of jurors concurring in the Indictment, is filed with the Clerk's Office.[213] Rule 6(c) only requires such a record be filed with the clerk and not made public absent an Order. We received no request for such an order. There is no reason to grant a new trial on these grounds.

Mr. James also speculates the grand jury's session may have lasted more than eighteen months and thereby obliquely challenges the Indictment obtained in violation of Federal Rule of Criminal Procedure 6(g). No defendant raised this objection before trial despite ample opportunity to do so and the time has long passed to raise it.[214] Mr. James also fails to present evidence to

suggest a violation of the grand jury term limit occurred even after Judge Miller granted access to several grand jury ministerial records over a year before the final deadlines for pretrial motions.[215] Nor does he show prejudice. We will not consider untimely and groundless challenges to procedural issues.[216]

### 6. The conspiracy charge properly includes both marijuana and cocaine.

Mr. James argues we erred by allowing the United States to maintain a conspiracy charge including both marijuana and cocaine.[217] Mr. James argues the grand jury improperly charged both drugs and the charge must be stricken as duplicitous. "Duplicity is the joining in a single count of two or more distinct and separate offenses."[218] Mr. James joined a pretrial motion raising this same argument. We reviewed and denied the motion.[219] We maintain our earlier ruling.

The grand jury charged Mr. James with a conspiracy to manufacture and possess with intent to distribute marijuana and cocaine. Both marijuana and cocaine are controlled substances. Congress intended the charge of conspiracy to criminalize the agreement to commit unlawful acts.[220] The agreement is the "unit of prosecution" in a conspiracy charge, *i.e.* the conduct which Congress wanted to prohibit. A single conspiracy may have two or more objectives, but there is nevertheless only one crime: the criminal agreement.[221]

The evidence confirmed marijuana and cocaine are the objectives of the criminal agreement Mr. James made with Mr. Williams. The heart of his offense is the agreement itself. The conspiracy charge appropriately includes both marijuana and cocaine.

### 7. The charging of two firearms offenses involving Mr. Pogson's death did not prejudice Mr. James.

Mr. James argues the two firearms charges involving Mr. Pogson's death are improper because they charge two offenses based on the same set of facts.[222] Mr. James argues these charges

are unfairly multiplied, or multiplicious, because they suggested to the jury he committed more than one crime for the exact same conduct.[223]  We disagree.

"Multiplicity is the charging of a single offense in separate counts of an indictment."[224] The United States concedes the unit of prosecution for both these firearms charges is the same conduct: Mr. Pogson's murder.[225] If the jury had convicted Mr. James of both offenses, the United States would have agreed we must vacate one of them.[226] At bottom, the United States asserts no remedy is necessary because the jury only convicted on one of the charges and Mr. James waived his multiplicity challenge by not raising it before trial.[227]

The two charges represent alternate theories motivating Mr. Pogson's murder: murder in support of drug trafficking or murder for its own sake. Should Mr. James have been convicted of both charges, we agree with the United States Mr. James would be entitled to have one of the convictions vacated.[228] Punishment for both would have violated our Constitution's prohibition on double jeopardy.[229] Constitutional errors cannot be waived by failure to raise before trial.[230] But our jury avoided the need for our intervention or the possibility of error by only convicting on one charge.

The Supreme Court, through Federal Rule of Criminal Procedure 7(c)(1), allows the United States to assert alternate theories of liability, or alternate means by which a defendant allegedly committed a crime, within a single charge.[231] The United States' ability to bring alternate theories of liability through separate and distinct charges is murkier.[232] If convicted of both charges, Mr. James could only be sentenced for one of them. But our jury did not convict on both charges. The jury weighed the evidence. The evidence, viewed in the light most favorable to the United States, allowed a jury to find Mr. James participated in Mr. Pogson's murder, but discounted testimony from a serial felon eyewitness Mr. James pulled the trigger. The grand jury charged aiding and

abetting liability for the two firearms offenses related to Mr. Pogson's death. Aiding and abetting liability permits a guilty finding on the firearms charge even if Mr. James did not fire the bullets killing Mr. Pogson.

Our jury heard evidence Mr. James murdered Levar Pogson. The acquitted firearms charge did not open the door to otherwise inadmissible evidence. The murder charge ensured the jury would hear evidence intended to prove Mr. James murdered Mr. Pogson. Had our jury convicted Mr. James on both firearms charges, we agree Mr. James would be entitled to relief. But the relief would be to vacate one of the convictions, not to conduct a new trial.

Mr. James cannot show he was prejudiced by the United States charging two crimes as alternate theories of liability. The better course may be to charge one crime conjunctively alleging alternative theories of liability. But any error here it is not fatal to the basic fairness of the trial. And we can cure this concern by dismissing the offending conviction at or before sentencing. We are not today in this alternative universe. The jury did not convict Mr. James of two offenses. Our jury's careful analysis resulting in one conviction confirms Mr. James suffered no prejudice and is not entitled to a new trial.[233]

## IV.

The necessary integrity of our adversarial system requires skilled trial lawyers. They must demonstrate many skills in and out of the courtroom. We expect, at a minimum, vigorous advocacy balanced with utmost candor to the Court and a collegial respect for our colleagues and citizens. We appreciate the emergent pressures in the days and nights shortly before and during trial. These pressures likely become more difficult managing a prosecution delayed for years apparently causing the absence of witnesses. We also appreciate the pressures upon the United States Attorney to secure their view of justice for our community and victims.

But the attorney oath also requires timely advocacy. We denied the United States' attempts to further delay trial upon Judge Smith's passing. We ordered timely compliance again and again.[234] We entered orders to ensure standard disclosures.[235] And we cured issues time and time again to ensure Messrs. James and Williams (along with their co-Defendants going to trial next month) could review documents and prepare for witnesses.[236] But we are today regrettably compelled to address our concern with a lapse in judgment concerning sealing records not rising to the level of prosecutorial misconduct but not at all consistent with the standards of diligence and candor expected from trial counsel.

Precluding public access to material not warranting a seal is contrary to counsel's obligations to the Court and the public who are owed disclosure absent a court order. A lapse of candor is also contrary to counsel's obligations especially arising from unilaterally precluding public access to information without judicial approval, disregarding our Order, and then offering changing and arguably misleading explanations to the Court causing extended hearings and briefings.

We today direct the United States Attorney for the District of the Virgin Islands to remind the public servants working at her direction of their obligations under the Local Rules and duty of candor and then file a Notice confirming her compliance with the obligations imposed by today's Order. We decline further sanction or referral but require this warning and notice upon finding:

- The United States, Mr. James, and Mr. Williams improperly precluded public access to filed documents at ECF Nos. 278, 279, 404, 432, 486, 498, 645, and 655 under seal;

- We required the parties on December 7, 2023 to show particularized harm to justify continuing preclusion of public access to documents;[237]

- On December 18, 2023, we required the United States to "no later than December 21, 2023, file a Notice of earlier sealed documents attaching: ECF No. 645 [United States' Motion to continue] redacting only the second, third, and fourth lines of the second paragraph; ECF No. 404 [United States' writ ad testificandum] redacting only the name and register number of the identified witness in a stale document; and, ECF No. 655 [Mr. Williams's response to ECF No. 645] redacting only the fourth and fifth lines in par.27 from 'Law' to '2023.'"; [238]

- The United States did not comply with our Order by December 21, 2023 nor did it ask for an extension as it did many other times for other delays;

- So, on December 22, 2023, we ordered the United States comply with our December 18, 2023 Order by December 27, 2023, and required it show cause as to why we should not sanction their disregard of our Order;[239]

- The United States timely filed its Notice of unsealed documents (at ECF No. 753), a redacted version of ECF No. 645 (at ECF No. 752), and a redacted version of ECF No. 404 (at ECF No. 751);

- The United States did not (and has not to date) filed an amended non-redacted version of ECF No. 655 (Mr. Williams's Response) and has never explained why;

- The United States also responded to our December 22 Show Cause Order representing it attempted to electronically file the required Notice on December 18, but United States Courts, PACER, and the DVI ECF system were inaccessible. It then swore attempting to file a paper copy with the clerk's office but someone in the clerk's office advised the United States it could not do so; [240]

- The United States Attorney, like all parties, is subject to Local Rule 5.4(k) designed to address this very situation by providing parties must seek permission from the Court to file a paper copy when technical failures preventing timely filing on the ECF system; [241]

- The United States did not address why an unsuccessful attempt on December 18 prevented it from timely compliance by our deadline of December 21, 2023. But then the United States later conceded it mistakenly represented the attempt on occurred on December 18 but it actually tried to file the overdue papers on the last due date December 21 without offering a reason why it did not comply before the last day;

- We granted the United States leave on December 28, 2023 to present evidence at the long-scheduled January 9 Pretrial Conference supporting its claim of a Clerk of Court employee advising someone of not accepting paper filings in ECF No. 755 "including testimony or sworn statements from the person(s) attempting to file electronically or in person on each of the four days and specific details on who spoke to the Clerk of Court, who they spoke to, and when so as to allow the United States to represent the Court would not accept their timely paper filings;"[242]

- We confirmed no electronic issues on filing with the Clerk of Court from December 18 until December 21 including confirming the same United States Attorney's office filed papers. We also confirmed no one in the Clerk's Office recalled a request to paper file as Local Rule 5.4(k) requires the Clerk of Court accept paper filings with a certification. We also confirmed no one could recall a person from the United States Attorney's Office in the same building as the Clerk of Court stopped by asking to paper file;

- We proceeded to hear evidence on this claim of a Clerk of Court declining to accept filings beginning at 6:38 PM during our day long January 9, 2024 pretrial hearing. The United States presented a witness on the technical issues the office experienced when attempting to file.

The witness, one of their IT staff, explained a systemwide problem arising from the Department of Justice only maintaining eight total IP addresses for security reasons and to prevent hacking or back-tracing. He learned of this problem because of their problems filing in this case on the same day as our hearing. He then explained the limited IP access decision may cause the ECF system to deny access if more than sixty users from the same IP address all access the ECF system within the same minute. The lock out lasts for thirty minutes;[243]

- The United States Attorney then proceeded to stand by her written representation of attempting to file in person but an unidentified person in a small office with whom the United States has "always enjoyed an excellent working relationship" told the person they could not paper file.  The United States Attorney represented her office attempted to paper file and "approached the clerk's office **with paper in hand** and we explained the difficulties": they attempted to alternatively to file the document by "**deliver[ing] a paper copy** as we have in many cases in the past";[244]

- The United States Attorney admitted her office did not follow Local Rule 5.4(k) requiring a certification from the Court before trying to file a paper copy with the Clerk's office; When we questioned on this point, the United States Attorney responding by questioning "I don't know if the Court is familiar with the clerk's office here in this building";[245]

- We ended the hearing accepting the United States Attorney's unrebutted representation of attempting to paper file with the Clerk of Court but being unable to do so in paper or electronically due to Department of Justice IP address issues;

- But the United States then left post-it notes on the podium given by associate attorneys and paralegals during the United States Attorney's presentation which offered a different

view than she represented on the record.  The post-it notes confirmed the attorneys "did not take anything to [Clerk of Court] I only called"; [246]

- We asked the United States to explain the representations of taking filings "paper-in-hand" to the Clerk of Court's office when counsel knew the United States Attorneys Office did not take anything to the Clerk of Court; [247]

- The United States responded the post-it note stating "did not take anything to [Clerk of Court]" is "consistent" with their representations in Court; it described their response to our questions as "regrettable" and counsel then learned and meant to say her office "contacted" the Clerk to request a filing and the Clerk's office told the United States it could not file;[248] and,

- The United States never withdrew its representation of hand delivering the filing and then being told it could not paper file.

The United States Attorney's conduct required us to hold separate hearings, call upon public servants working on other matters for the public, and take time away from counsels' and our trial preparations. The United States Attorney caused these unnecessary efforts first by disregarding a Local Rule of which counsel apparently had no knowledge and then misleading us (possibly out of ignorance of the facts) in response to specific questions concerning the filings of documents. We are unclear what the United States Attorney is suggesting by asking if we are familiar with the Clerk's Office "in this Building.".  We are now several months after the hearing. But we clearly recall her tone, beyond the words in the transcript, suggesting we could consider more left unsaid.  We categorically reject this inference should this be the United States' intent. The Clerk of Court and her professionals provided extraordinary service with full candor.  The Clerk of Court cannot bend the Local Rules for any party including the United States. Counsel made a mistake (as we all do) but then doubled down in attempting to excuse the error.

We appreciate the United States Attorney eventually recognizing (at least partially) the concerns. We cannot find intent to deceive. Her and her experienced colleagues' candor, especially after our discovery of the post-it note on the podium and calling the United States to explain, is exactly what we expect from the sovereign prosecuting a claim. This limited conduct instead arises from missing a court deadline and attempting to avoid sanction through cavalier regrettable statements including relating to our Clerk of Court processes. The conduct related to improperly sealed documents (known to the Defendants) and not following our Order does not affect the integrity of the evidence; it instead warrants a warning and educational moment for the attorneys and the persons working with them in public service. This conduct does not warrant a sanction or reprimand beyond this Notice. We anticipate all counsel will meet their obligations in their upcoming representations particularly after the Notice posted to all members of the United States Attorney's office in the District.

## V.    Conclusion

We deny Mr. James's motion for relief under Rules 29 and 33.

---

[1] ECF No. 1032, N.T. Jan. 25, 2024 at 188.

[2] *Id*. at 185, 191.

[3] ECF No. 941; ECF No. 1032, N.T. Jan. 25, 2024 at 162, 257-58.

[4] ECF No. 1032, N.T. Jan. 25, 2024 at 149; 1033 at 103-04.

[5] ECF No. 1032, N.T. Jan. 25, 2024 at 149. Mr. Rivera, a former member of a different sub-gang, Bounty Hunter Bloods, swore the United Blood Nation contains over 400 different sub-gangs. *Id*. at 132.

[6] *Id*. at 190.

[7] *Id*. at 176.

[8] *Id*. at 184: 8-12, 255.

[9] ECF No. 1028, N.T. Jan. 19, 2024 at 229.

[10] *Id*. at 228-231.

[11] *Id*. at 229.

[12] *Id*. at 232.

[13] *Id*. at 232.

[14] ECF No. 1032, N.T. Jan. 25, 2024 at 245-46.

[15] *Id*. at 229.

[16] ECF No. 1019 at 33.

[17] United States Exhibit 602, Call Session 491; ECF Nos. 1030, N.T. Jan. 23, 2024 at 263; 1032, N.T. Jan. 25, 2024 at 250-253.

[18] United States Exhibit 602, Call Session 491; ECF No. 1032, N.T. Jan. 25, 2024 at 253.

[19] United States Exhibit 602, Call Session 491; ECF No. 1032, N.T. Jan. 25, 2024 at 253.

[20] United States Exhibit 602, Call Session 491; ECF No. 1032, N.T. Jan. 25, 2024 at 253.

[21] United States Exhibit 602, Call Session 491; ECF No. 1032, N.T. Jan. 25, 2024 at 253.

[22] ECF No. 1032, N.T. Jan. 25, 2024 at 190.

[23] ECF No. 1031, N.T. Jan. 24, 2024 at 70.

[24] ECF No. 1030, N.T. Jan. 23, 2024 at 329-332.

[25] *Id*. at 332:13-15; 342:4-11. Robert Brown testified to these transactions. Mr. Brown is a currently incarcerated convicted felon and self-admitted double murderer who testified at trial pursuant to a cooperation agreement with the United States.

[26] *Id*. at 263. The grand jury indicted Ms. Ceaser with Mr. James. ECF No. 1. She pled guilty to her role in the cocaine smuggling in exchange for her cooperation. She is currently incarcerated.

[27] ECF No. 1030, N.T. Jan. 23, 2024 at 205:8-10; 206:6-10; 207:24-208:2.

[28] *Id*. at 274.

[29] *Id*. at 275.

[30] *Id*. at 275.

[31] *Id*. at 282-83.

[32] *Id*. at 281.

[33] *Id*. at 289-290.

[34] *Id*. at 351:6-16.

[35] *Id.* at 350-351.

[36] ECF No. 1031, N.T. Jan. 24, 2024 at 9.

[37] *Id.* at 10, 72.

[38] *Id*. at 22-24.

[39] *Id*.

[40] *Id.* at 41, 74; ECF No. 1035, N.T. Jan. 30, 2024 at 84-88.

[41] The parties stipulated to Mr. Williams's release date. ECF No. 1034, N.T. Jan. 29, 2024 at 116. The Virgin Islands released Mr. Williams because the Supreme Court of the Virgin Islands reversed Mr. Williams's murder conviction and ordered a new trial. *See Williams v. People of the Virgin Islands*, 59 V.I. 1043 (2013).

[42] ECF No. 1032, N.T. Jan. 25, 2024 at 194. Alexis Rivera testified as an eyewitness to the murder. Mr. Rivera has an extensive criminal record.

[43] ECF No. 1033, N.T. Jan. 26, 2024 at 25-26.

[44] ECF No. 1032, N.T. Jan 25, 2024 at 194.

[45] *Id.* at 194, 195, 196:11-13.

[46] *Id.* at 197.

[47] *Id.* at 196-97.

[48] *Id.* at 197.

[49] *Id*. at 198, 202.

[50] *Id.* at 203:13-24.

[51] *Id.* at 203.

[52] *Id.* at 199.

[53] *Id.* at 199; ECF No. 1033, N.T. Jan. 26, 2024 at 90.

[54] ECF No. 1033, N.T. Jan 26, 2024 at 88-89.

[55] ECF Nos. 1032, N.T. Jan. 25, 2024 at 199:18-200:6; 1033, 1033, N.T. Jan. 26, 2024 at 90.

[56] ECF No. 1032, N.T. Jan. 25, 2024 at 201.

[57] *Id.*

[58] ECF No. 1034, N.T. Jan. 29, 2024 at 18-22, 57-61. "Flipping chickens" refers to the process of finding the aggressive birds who will be the best for cock fighting at the "pit." *Id.* at 18:20-24.

[59] *Id.* at 109.

[60] *Id.* at 126.

[61] *Id.* at 135-36.

[62] *Id.* at 138.

[63] *Id.* at 139.

[64] *Id.* at 141.

[65] *Id.* at 154-161.

[66] *Id.* at 168.

[67] *Id.* at 183-186.

[68] *Id.* at 169.

[69] *Id.* at 171, 173.

[70] *Id.* at 174.

[71] *Id.* at 174.

[72] *Id.* at 175.

[73] *Id.* at 175.

[74] *Id.* at 178.

[75] *Id.* at 178-180.

[76] ECF No. 1028, N.T. Jan. 19, 2024 at 86.

[77] *Id.* at 86-87.

[78] *Id.* at 88.

[79] ECF No. 1033, N.T. Jan. 26, 2024 at 25.

[80] ECF No. 1028, N.T. Jan. 19, 2024 at 89.

[81] *Id.* at 105.

[82] *Id.* at 87.

[83] ECF No. 1035, N.T. Jan. 30, 2024 at 65.

[84] *Id.* at 65-70.

[85] ECF No. 1028, N.T. Jan. 19, 2024 at 193.

[86] *Id.* at 207.

[87] *Id.* at 205.

[88] ECF No. 1032, N.T. Jan. 25, 2024 at 204-205.

[89] *Id.* at 205. Mr. Rivera then entered a witness protection and confidential source agreement program with the DEA. He moved multiple times in response to continuing threats.

[90] *Id.* at 207:14-15. Virgin Islands Police assigned Detective Frankie Ortiz as the lead investigator on the Pogson homicide. The United States did not call him as a witness although identifying him as a witness in pretrial submissions.

[91] *Id.* at 207-08.

[92]  ECF No. 1031, N.T. Jan. 24, 2024 at 97.

[93] *Id.* at 97, 108, 179.

[94] *Id.* at 204:13-15.

---

[95] *Id*. at 289-90.

[96] *Id.* at 293.

[97] *Id.* at 292.

[98] *Id.* at 294.

[99] ECF No. 1028, N.T. Jan. 19, 2024 at 235-36.

[100] ECF No. 1029, N.T. Jan. 22, 2024 at 77.

[101] *Id.* at 80.

[102] *Id*. at 78-79.

[103] ECF No. 1028, N.T. Jan. 19, 2024 at 238.

[104] *Id*. at 254.

[105] ECF No. 1029, N.T. Jan. 22, 2024 at 106.

[106] ECF Nos. 1028, N.T. Jan. 19, 2024 at 237; 1029, N.T. Jan. 22, 2024 at 105-06.

[107] ECF Nos. 1028, N.T. Jan. 19, 2024 at 254; 1029, N.T. Jan 22, 2024 at 110, 112.

[108] ECF No. 1029, N.T. Jan. 22, 2024 at 105.

[109] *Id*.

[110] *Id*.

[111] ECF No. 1028, N.T. Jan. 19, 2024 at 255-56.

[112] ECF No. 1029, N.T. Jan. 22, 2024 at 128.

[113] *Id.* at 108.

[114] *Id.* at 123-24.

[115] *Id*. at 108.

[116] *Id.* at 126.

[117] *Id.*; ECF No. 1029, N.T. Jan. 22, 2024 at 250.

[118] ECF No. 1028, N.T. Jan. 19, 2024 at 248.

[119] *Id.*

[120] *Id.*

[121] *Id.* at 251:14.

[122] *Id.* at 256; ECF No. 1029, N.T. Jan. 22, 2024 at 127.

[123] ECF No. 1029, N.T. Jan. 22, 2024 at 131, 132.

[124] *Id.* at 132-33.

[125] *Id.* at 132.

[126] *Id.*

[127] *Id.* at 132, 142.

[128] *Id.* at 132.

[129] *Id.*

[130] *Id.* at 142.

[131] *Id.* at 133.

[132] *Id.* at 134, 146.

[133] *Id.* at 135.

[134] *Id.* at 135, 144.

[135] *Id.* at 151.

[136] ECF Nos. 1, 555.

[137] ECF No. 555 at 1. Count One, in violation of 21 U.S.C. § 846.

[138] *Id.* at 2. Count Three, in violation of 21 U.S.C. § 841.

[139] *Id.* at 2-3. Count Four in violation of 21 U.S.C. § 841.

[140] *Id.* at 6-7. Count Nine, in violation of 18 U.S.C. § 924(c)(1)(A).

[141] *Id*. at 8. Count Twelve, in violation of 18 U.S.C. § 924(j)(1). This count included aiding and abetting liability.

[142] *Id*. at 8-9. Count Thirteen, in violation of 18 U.S.C. § 924(j)(1). This count included aiding and abetting liability.

[143] *Id*. at 9. Count Fourteen, in violation of 14 V.I.C. §§ 921, 922(a)(1) & 923(a). This count included aiding and abetting liability between Joh Williams and Ivan James.

[144] A lengthy pretrial stage followed the first Indictment. Between indictment and trial, five different district judges and two magistrate judges presided over the case. *See generally*, ECF Docket Report. Counsel also repeatedly requested continuances. *See, e.g*., ECF Nos. 342, 387, 538, 642, 645.

Our former colleague the Honorable Curtis V. Gomez first set trial for various dates in April 2020. ECF Nos. 91, 97, 122. In response to the global COVID-19 pandemic, Judge Gomez continued trial until August 2020. ECF No. 136. The Clerk of Court later reassigned this case to Chief Judge Robert A. Malloy but Judge Malloy recused himself a few days later. ECF No. 153. The Court of Appeals then reassigned this case to the Honorable Anne E. Thompson. ECF No. 156. Judge Thompson adjourned the August 2020 trial date to a date to be determined. Text entry between ECF Nos. 160 and 161. Judge Thompson also granted the United States' request to designate the case as complex. ECF No. 163. Judge Thompson managed the case until December 23, 2021. ECF No. 272. The Court of Appeals then transferred the case to our late colleague Judge Edward G. Smith. ECF No. 272. Judge Smith set trial for November 2022, but later granted continuance requests moving the trial to February 2023, then April 2023, August 2023, and October 2023. ECF Nos. 296, 341, 348, 387, 449, 522. Judge Smith granted a final continuance in August 2023 setting trial for January 2024. ECF No. 559. Judge Smith passed in late November 2023. The Court of Appeals designated us consistent with the pending trial on December 4, 2023. ECF No. 649.

The parties then filed a flurry of pretrial motions before us often repeating arguments made before our colleagues. We studied the extensive record. We saw the six Defendants' renewed severance motion a little differently than our colleagues given the gravity of the murder charge against only Messrs. James and Williams. The remaining Defendants did not face charges based on violence. We granted Defendants' motion to sever the charges involving the men charged with the Levar Pogson murder from the other men charged and confirmed trial involving charges against Ivan James and co-Defendant Joh Williams for the long-scheduled January 2024 trial date. ECF No. 669. We begin the trial of the remaining four Defendants on the non-murder charges against them on a date chosen with counsel's consent this June 2024.

[145] The hearings occurred in St. Thomas on April 5, 2023 and January 9, 2024. ECF Nos. 476, 834.

[146] ECF No. 598. We granted the request for a hearing, but ultimately denied any relief. ECF No. 875.

[147] ECF No. 613. We denied this motion. ECF No. 658.

[148] ECF No. ECF 648. We denied this motion. ECF No. 840.

[149] ECF No. 620. We granted this motion in part when we severed Mr. James and Mr. Williams trial from the persons not charged with Levar Pogson's murder. ECF No. 669.

[150] ECF No. 846. Mr. James cited *Bruton v. United States*, 391 U.S. 123 (1968), as requiring severance. We denied the motion. ECF No. 884. Mr. James renews this argument today.

[151] ECF No. 603. We denied the motion. ECF No. 690. Mr. James renews this argument today.

[152] ECF No. 589. We denied this motion. ECF No. 867.

[153] ECF No. 934. We denied the motion. ECF No. 974. Mr. James renews this argument today.

[154] ECF No. 973. We denied this motion. ECF No. 976. Mr. James re-raises parts of this argument today.

[155] ECF No. 1033, N.T. Jan. 26, 2024 at 165.

[156] *Id.*

[157] *Id.*

[158] *Id.* at 166-172.

[159] *Id.* at 166-170.

[160] ECF No. 990.

[161] ECF No. 990.

[162] ECF No. 1035, N.T. Jan. 30, 2024 at 16-45, 113-176.

[163] *Id.*

[164] *Id.* at 161. We ordered the Bureau of Corrections comply with Mr. Williams's subpoena for documents. ECF No. 913. Mr. Williams believed the Bureau's production lacked information. We held a hearing and heard testimony on January 26, 2024 from a Bureau of Corrections's official about Joh Williams's incarceration records. ECF Nos. 945; 1033, N.T. Jan. 26, 2024 at 105-117. Mr. Williams requested the adverse inference instruction during our charging conference. ECF No. 1035, N.T. Jan. 26, 2024 at 163-167. We found the instruction unwarranted because the Virgin Islands Bureau of Corrections was a non-party and did not stand in the shoes of the United States. *Id.* at 167. We further found the Bureau's conduct demonstrated sloppy record keeping not intentional destruction and fell short of the standard for an adverse inference instruction. *Id.* at 167-68.

[165] ECF No. 1035, N.T. Jan. 30, 2024 at 172-175.

[166] *Id.* at 161, 171.

[167] ECF No. 991.

[168] ECF No. 997.

[169] Verdict Slip, ECF No. 999.

[170] Verdict Slip, ECF No. 999.

[171] ECF No. 1026.  Mr. James moved for relief after several requested extensions. *See* ECF Nos. 1000, 1010, 1018. Mr. Williams also sought and received several extensions to move for post-trial relief. ECF No. 1000, 1010, 1024. Mr. Williams did not move for post-trial relief.

[172] The Supreme Court, through Federal Rule of Criminal Procedure 29, requires us to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "We interpret the evidence in the light most favorable to the government as the verdict winner and 'do not weigh evidence or determine the credibility of witnesses.' " *United States v. Zayas*, 32 F.4th 211, 216 (3d Cir. 2022) (quoting *United States v. Gambone*, 314 F.3d 163, 169–70 (3d Cir. 2003)). We must sustain the jury's verdict "if a rational trier of fact could have found the defendant guilty beyond a reasonable doubt and if the verdict is supported by substantial evidence." *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006); *see also United States v. Lore*, 430 F.3d 190, 230-4 (3d Cir. 2005) ("The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high."). We "must simply determine whether 'the conclusion chosen by the factfinders was permissible.' " *United States v. McGill*, 964 F.2d 222, 230 (3d Cir. 1992) (quoting *United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984)).

[173] ECF No. 1026-1 at 15.

[174] ECF No. 1029, N.T. Jan. 22, 2024 at 134.

[175] ECF No. 1030, N.T. Jan. 23, 2024 at 329-330.

[176] *Id.* at 244:3-13.

[177] *Id.* at 275.

[178] It appeared the cocaine charge reflected the date of the marijuana eradication operation instead of the search of Mr. James's residence during which agents found the 463 gram package of cocaine. We addressed sua sponte this date issue with the parties during discussion of Mr. James's at-trial Rule 29 motion. ECF No. 1034, N.T. Jan. 29, 2024 at 7. We found the charge's "on or about"

language elastic enough to survive our dismissal under Rule 29 but permitted fair argument by counsel in closing. *Id*. at 9.

[179] *See, e.g.*, ECF No. 1029, N.T. Jan. 22, 2024 at 113:5-24.

[180] United States Exhibits 405.1-405.4, 405.7-405.29, 405.34.

[181] ECF No. 1029, N.T. Jan. 22, 2024 at 108:14-25; United States Exhibit 405.33.

[182] ECF No. 1027, N.T. Jan. 18, 2024 at 251; United States Exhibit 405.31.

[183] ECF No. 1029, N.T. Jan. 22, 2024 at 126:17-127:3.

[184] ECF No. 1026-1 at 5.

[185] ECF No. 1026-1 at 6-7.

[186] ECF No. 1031, N.T. Jan. 24, 2024 at 86-87, 93-98, 106, 190-204.

[187] *Id*. at 93-101, 150-51, 181.

[188] *See United States v. Rawlins*, 606 F.3d 73, 82-83 (3d Cir. 2010) (holding chain of custody issues generally go to weight of evidence, not admissibility); *see also Reed v. Davis*, No. 20-11523, 2023 WL 377530, *10 (D. N. J. June 2, 2023) (finding no error when prosecution did not call a witness to testify at trial regarding the procurement of DNA samples or their chain of custody (quoting *Johnson v. Inch*, No. 14-22836, 2020 WL 7130690, at *11 (S.D. Fla. Mar. 6, 2020)).

[189] ECF No. 1039 at 16.

[190] ECF No. 1032, N.T. Jan. 25, 2024 at 203:25-204:2

[191] *See United States v. Serrano-Delgado*, 375 F.Supp.3d 157, 164 (D. P.R. 2019) (discussing aiding and abetting liability in context of 18 U.S.C. § 924(c) and (j)).

[192] The Court in *Pinkerton* instructed the United States may prove the guilt of one defendant through the acts of another defendant when the acts are (1) committed within the scope and in furtherance of a conspiracy of which the defendant was a member, and (2) the acts were reasonably foreseeable as a natural consequence of the conspiracy. *United States v. Lopez*, 271 F.3d 472, 480 (3d Cir. 2001) (applying *Pinkerton* Doctrine to Virgin Islands law) (citing *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946)). We included this direction in our charge reviewed by counsel without objection. ECF Nos. 1035, N.T. Jan. 30, 2024 at 121, 130-131, 175; 1036, N.T. Jan. 31, 2024 at 59-61.

[193] *See United States v. Powell*, 469 U.S. 57, 64-65 (1984); *Dunn v. United States*, 284 U.S. 390, 393-394 (1932).

[194] The Supreme Court, through Federal Rule of Criminal Procedure 33, directs we may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). We may grant a Rule 33 motion if the jury rendered a verdict "contrary to the weight of the evidence." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). Unlike a Rule 29 motion, we do "not view the evidence favorably to the Government, but instead exercise [our] own judgment in assessing the Government's case." *Id*. We may also grant a Rule 33 motion if evidentiary errors "so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (quoting *United States v. Hill*, 976 F.2d 132, 145 (3d Cir. 1992)). Rule 33 motions "are not favored and should be 'granted sparingly and only in exceptional cases.' " *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting *Government of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)). We may grant a Rule 33 motion "only if" we identify "a serious danger ... an innocent person has been convicted." *Id*. (quoting *Johnson*, 302 F.3d at 150).

[195] ECF No. 1026-1 at 14.

[196] Exhibit 602.

[197] ECF No. 846. We denied the motion. ECF No. 884.

[198] ECF No. 1039 at 19. Alexis Rivera credibly identified the second speaker as Mr. Williams's sister. ECF No. 1032, N.T. Jan. 25, 2024 at 245-247.

[199] *Bruton v. United States*, 391 U.S. 123, 126-28 (1968); *see also Richardson v. Marsh*, 481 U.S. 200, 201-02 (1987) (applying the *Bruton* rule); *Johnson v. Superintendent Fayette SCI*, 949 F.3d 791 (3d Cir. 2020) (applying *Bruton*).

[200] *See United States v. Hall*, 821 F. App'x 114, 118 (3d Cir. 2020) ("Additionally, the admissions of co-conspirators that are made during and in furtherance of the conspiracy are not hearsay."); *see also United States v. Hendricks*, 395 F.3d 173, 181 (3d Cir. 2005) (collecting authorities holding court may still admit co-conspirator statements post-*Bruton*).

[201] *United States v. Weaver*, 507 F.3d 178, 181 (3d Cir. 2007) (admitting co-conspirator statements when one party to phone call was not charged in conspiracy but finding statements still in furtherance of conspiracy).

[202] ECF Nos. 1032, N.T. Jan. 25, 2024 at 251-252; 1033, N.T. Jan. 26, 2024 at 138-39; 1036, N.T. Jan. 31, 2024 at 43-44.

[203] ECF No. 1026-1 at 7-10, 15-16.

[204] *U.S. v. Carr*, No. 15-455, 2016 WL 4087248, at *8 (E.D. Pa. Aug. 1, 2016) (citing *U.S. v. Hakim*, 344 F.3d 324, 333 (3d Cir. 2003)).

[205] *United States v. Norris,* 753 F.Supp.2d 492, 518 (E.D. Pa. 2010) (internal quotations and citation omitted).

[206] *United States v. Savage*, 970 F.3d 217, 315 (3d Cir. 2020) (the layout of the verdict form is reviewed for abuse of discretion like other trial management rulings).

[207] *See, e.g.* ECF Nos. 476, 617, 834.

[208] *See, e.g.,* Fed. R. Evid. 611; *United States v. Savage*, 970 F.3d 217, 315 (3d Cir. 2020); *Duquesne Light Co. v. Westinghouse Elec. Corp*., 66 F.3d 604, 609 (3d Cir. 1995).

[209] *United States v. Gagliardi*, No. 04-796, 2005 WL 1592947, at *4 (E.D. Pa. July 5, 2005) (citing *United States v. Walker*, Nos. 94-488, 94-554, 2000 WL 378532, at *10 (E.D. Pa. Apr. 4, 2000)).

[210] ECF No. 934.

[211] ECF No. 974.

[212] ECF No. 1026-1 at 13.

[213] *See United States v. Blyden,* No. 09-20, 2015 WL 111089736, at *2 n.1 (D.V.I. Sept. 3, 2015) (noting the "Court does not place the page signed by the grand jury foreperson on the docket" but instead "retain[s] that page in its records.").

[214] *See* Fed. R. Crim. P. 12(b)(3) (requiring a defendant to raise a challenge to the grand jury proceeding through pretrial motion).

[215] Co-defendant Ariel Petersen moved before trial for disclosure of grand jury information on August 10, 2022. ECF No. 311. Mr. James did not join the motion despite joining others. *E.g.* ECF No. 384. The United States opposed the motion but conceded to release the dates the grand jury empaneled and expired, the name of the supervising judge, and the dates the grand jury convened and returned indictments. ECF No. 312. Judge Miller granted in part and denied in part the motion requiring the United States disclose grand jury information in line with the United States concessions but denying the remainder of the requests. ECF No. 444.

[216] *See, e.g.*, *United States v. Thomas*, No. 21-416, 2022 WL 900400, *4 (E.D. Pa. March 28, 2022) (noting defendant's speculation that additional video evidence exists is insufficient to support a challenge); *United States v. Kellam*, No. 14-323, 2022 WL 175332, *4 (E.D. Pa. January 19, 2022) (in Section 2255 context, refusing to consider claim for relief based on "pure speculation").

[217] ECF No. 1026-1 at 15. While Mr. James uses the terms "multiplicious" to describe the conspiracy charge, his argument is for duplicity.

[218] *United States v. Starks*, 515 F.2d 112, 116 (3d Cir. 1975).

[219] *See* ECF No. 690.

[220] *Braverman v. United States*, 317 U.S. 49, 52 (1949).

[221] *See United States v. Gomberg*, 715 F.2d 843 (3d Cir. 1983) (holding a conspiracy charge involving two different controlled substances is not duplicitous, but merely involves two objects).

[222] ECF 1026-1 at 21. While Mr. James uses the term "duplicity" to describe the two firearms charges, his argument is for multiplicity.

[223] *Id.*

[224] *United States v. Kennedy*, 682 F.3d 244, 254 (3d Cir. 2012).

[225] ECF No. 1039 at 11, n.4.

[226] *Id.*

[227] ECF No. 1039 at 11.

[228] *See Stevenson v. United* States, No. 18-57, 2019 WL 908753, *2 (E.D. Pa. Feb. 22, 2019) (in Section 2255 context, recognizing remedy for convictions on multiplicious counts is to dismiss offending counts, effectively merging the counts for sentencing); *United States v. Platter*, 514 F.2d 782, 787 (8th Cir. 2008) (agreeing the proper remedy when a defendant is convicted of multiplicious counts is merging the counts for sentencing by vacating offending counts).

[229] *United States v. Stanfa,* 685 F.2d 85, 86–87 (3d Cir. 1982).

[230] *United States v. Marino*, 682 F.2d 449, 454, 454 n.3 (3d Cir. 1982). In a forerunner to Section 924, our Court of Appeals held the simultaneous possession of several firearms by a convicted felon constitutes a single offense. Mr. Marino did not raise a multiplicity objection at all before the district court. Our Court of Appeals nevertheless held Mr. Marino could not be forced to serve his erroneous sentences due to waiver.

[231] "A count may allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means." Fed. R. Crim. Pro. 7(c)(1).

[232] *Compare United States v. Roy*, 408 F.2d 484, 492 n.4 (8th Cir. 2005) (requiring the United States to allege alternate theories in the conjunctive within a single charge when a statute provides two or more ways to commit an offense), *with United States v. Ridens*, 362 F.Supp. 358, 360 (E.D. Pa. 1973) (noting the trial court has discretion to require prosecution to elect between multiplicious counts and finding no prejudice after a conviction on multiplicious counts).

[233] *See Kennedy*, 682 F.3d at 253 ("The District Court correctly concluded, and the Government conceded, that concerns over multiplicity may be addressed at sentencing." (citing *United States v. Pollen,* 978 F.2d 78, 83 (3d Cir.1992)).

[234] *See, e.g.*, ECF Nos. 669, 678, 712, 828, 958.

[235] *See, e.g.*, ECF Nos. 712, 678.

[236] *See, e.g.*, ECF Nos. 874, 959.

[237] ECF No. 665.

[238] ECF No. 722.

[239] ECF No. 747.

[240] ECF No. 755.

[241] Local of Civil Procedure Rule 5.4(k) provides: "A Filing User whose filing is made untimely as the result of a technical failure and who is unable to make a timely filing by traditional means must seek appropriate relief from the Court." The local civil rules apply to procedural issues in criminal cases whenever the local criminal rules are silent. L. R. Crim. P. 1.2

[242] ECF No. 758.

[243] ECF No. 962 at 19-21.

[244] *Id*. at 4:5-7, 9:17-19 (emphasis added).

[245] *Id*. at 4:3-4.

[246] ECF No. 940-1.

[247] ECF No. 940.

[248] ECF No. 983.